. 4ws205
151  474

4ws205
166  264

4 WS 205
214     580

4 WS 205
f 33 SC ² 52

## Monongahela Navigation Company *against* Fenlon. Same *against* Bills.

If the parties to an executory contract make a provision in it, that any dispute which shall arise between them on the subject of the contract, shall be determined by an individual named, whose decision shall be final, no action will lie for a breach of the agreement by one against the other; but they must resort to the tribunal appointed by themselves, from whose award there is no appeal.

If parties by contract appoint an arbiter to settle their differences, they are bound by his award, although he may be interested in the contract which was the subject of reference.

ERROR to the District Court of *Allegheny* county.

These were actions of covenant against the Monongahela Navigation Company: one by Sherman Bills and George D. Foreman, and the other by James Fenlon and Joseph Patton. They involved the same principles.

The declaration set forth two several articles of agreement and specifications entered into between the parties: one for the construction by the plaintiffs of a lock and the other of a dam on the Monongahela river, alleging that they were always ready and willing to perform, and did perform all and singular the covenants entered into by them, &c.; and assigning for breach, that the defendants neglected to furnish the iron-work, cement and lime, as stipulated and required; that they did not pay for items necessarily occurring and not specified in the contracts according to the estimate of the engineer; that they failed to make monthly estimates, or to pay as agreed, upon estimates made; that they abandoned their said contracts without cause, and altogether failed to fulfil their agreement, or any part thereof.

And for further breach, the plaintiffs afterwards alleged that in consideration of said agreement they commenced, at great expense and with a large number of hands, &c., to perform their covenant, and in furtherance thereof accumulated a large amount of material, &c., procured to construct said lock and dam; performed work and labour in pursuance thereof to the amount of $25,000, and continued in the execution of the same until the 18th of May 1841, at which time the defendants abandoned the further prosecution of the same; and they (the plaintiffs) averred that they had done a large amount of the mason-work required in the construction of the said lock, and furnished timber for the dam at great expense, viz.—the former at $12 per perch, and the latter at $10 per cubic yard, and had stripped quarries, quarried stone, built

IV.—S

[Monongahela Navigation Company v. Fenlon.]

houses and shanties, procured iron, excavated the foundation of the lock and dam, built a crib dam, and done all other things necessary at a great expense, and if permitted to perform and fulfil their contract would have realized a large profit; but by reason of defendants' abandonment of the further prosecution of said work, they (the plaintiffs) had suffered damage, and though they had done and performed all the work, &c., and were then and there willing to finish and complete the same, as by agreement bound; yet protesting that the defendants had not performed their covenants, &c., they said that the defendants on the 18th of May 1841, without any reasonable cause for so doing, and against the will of the said plaintiffs, dismissed and discharged the said plaintiffs from the execution and performance of their said covenants, &c., and prevented and hindered them from performing, and did utterly refuse permission to them to make and construct the said lock and dam according to their contract, and did also refuse to perform their own covenants, or to pay the plaintiffs for work done and materials furnished in and about the construction of the said lock and dam, &c. The defendants pleaded "covenants performed, *absque hoc,* &c."

The plaintiffs read in evidence the agreements declared on, which contained the following clause:—

"It is also mutually agreed between the parties to these presents, that in any dispute which may arise between the contractor and the company, the decision of the engineer shall be obligatory and conclusive, without further recourse or appeal."

The plaintiffs then read in evidence the following entries on the minute-book kept by the defendants:—

"May 7, 1841. Mr. Shipton offered the following resolution: 'Resolved, that the work on lock and dam No. 4, be suspended for the present,' which resolution was referred to a committee of three members with instructions to report at next meeting.

"May 18, 1841. The committee to whom the foregoing resolution was referred, having reported 'that inasmuch as no answer had as yet been received from the Bank of the United States, they had not acted on the business referred to them,' the said committee was discharged from the further consideration of the subject, and the resolution of Mr. Shipton, as above recited, was 'taken up and carried;' and, on motion, it was further resolved, 'that the chief engineer be requested to make an estimate of the work done and materials found on lock and dam No. 4, and submit the same to the next meeting;' and 'that Mr. Cass, assistant engineer, be requested to take all necessary steps to preserve the timber and other perishable property belonging to the company at lock and dam No. 4.'"

The plaintiffs then called Mr. Callan, a witness, who testified "that he had been employed by and proceeded about a year ago, at the instance and request of the contractors, (plaintiffs), to make

an admeasurement and estimate of the work done and materials furnished by them at lock and dam No. 4." After exhibiting the estimate and admeasurement made by the witness of the work done and materials furnished as aforesaid, the witness having stated that it would require 3000 perches of masonry to complete the job, and that he had made an estimate of what that could be constructed for, the plaintiffs offered to prove by him the amount of materials and work necessary for the completion of the job, and the cost of the same, for the purpose of ascertaining what profits the plaintiffs might have made, if the defendants had not caused the work to be suspended. This evidence was objected to by the defendants, but the objection was overruled, and a bill of exceptions sealed.

The defendants then offered in evidence the deposition of W. Milnor Roberts, then chief engineer, taken under a rule of court, and which contained a final estimate of the work done by the plaintiffs, and the amount to which they were entitled under their contract, $2201.18. The witness also stated, that when he made the estimate he was a stockholder of the company. The plaintiffs objected to the reading of the deposition on the ground that the witness seemed to consider himself as an umpire, and that he had so connected his opinion and judgment with the estimates that they could not be separated, and that the jury should have the facts of the case disconnected from all impressions or opinion of the witness, as regarded the justice or fairness of his estimates under the circumstances.

Per Curiam.—So far as the witness states his opinion of the justice and fairness of his estimates, or of his being guided by circumstances in making it liberal, must be rejected. There is nothing else in the deposition, so far as now objected to, but what may be read. The estimate made by the witness is as proper for the consideration of the jury as the estimates offered by the plaintiffs. Those clauses *underscored* are rejected. The rest of the deposition as relates to estimates can be read.

To this opinion the defendants excepted.

The defendants requested the court to charge the jury that the estimate of the engineer was conclusive as to the amount of the plaintiffs' claim. But the court was of opinion that however much weight the opinion of the engineer was entitled to, it was but evidence and not conclusive. This opinion gave rise to the principal question argued in this court, and the only one decided.

*Williams*, for plaintiff in error.
*M'Candless* and *Biddle*, for Fenlon and Patton.
*Hampton* and *Metcalf*, for Bills and Foreman.

The opinion of the Court was delivered by
Rogers, J.—It would be an unprofitable labour to perplex our-

selves with a separate review of the numerous errors which have been assigned; for as there are principles common to each of the cases, it is believed that all that is material may be embraced in some general propositions which cover the whole ground of controversy.

The plaintiffs, after setting forth the articles of agreement and specifications as the foundation of their suits, allege a general performance, a willingness to perform the covenants on their part; that the defendants abandoned the contracts without cause, discharged them from the execution and performance of them, prevented and hindered them from performing their covenants, and utterly refused permission to make and construct the locks and dams, according to the agreement. For this the plaintiffs claim damages or compensation for the costs and price of the work done, to be estimated by the jury, for the profits they would have made had the work been completed, and also for the materials accumulated for the completion of the work and the preparatory expenses for the same. The defendants deny that they abandoned the work without cause, but contend that they had the right and were justified in suspending it, and they allege that the work was suspended with the assent of the plaintiffs. They deny that they refused permission to construct the lock and dam, or that they in any way hindered or prevented them from completing the same. It is further contended, that the compensation to which the plaintiffs are entitled is to be referred to the arbitrament of the engineer; that an estimate has been already made, and the sum awarded, or a great part thereof, has been paid. All that is essential to the cases under review may be included under the following general head: Had the defendants the right to suspend the contract, either temporarily or entirely? Did they abandon the work without cause, or were they justifiable in suspending the same, and was the work suspended with the assent of the plaintiffs? 2. The person or tribunal by whom the damages or compensation are to be estimated; and 3, the amount of damages which the plaintiffs may justly claim.

Under the first classification we may properly consider the rejection of the notice to the bidders of the 8th of July 1840, together with the proposals of the plaintiffs, and the acceptance thereof, under certain conditions, by Mr Roberts, the engineer and agent of the company. This evidence, which was rejected by the court, is very material in one point of view, because the company in the case of Lock No. 4 reserve the privilege of suspending the work, either temporarily or entirely, when the foundation of the first course of planking and two courses of masonry are laid. The court rejected the testimony, because all previous negotiations were merged in the subsequent contracts of the 26th of September 1840. Parol evidence cannot be received to contradict a written agreement; and when the contract has been reduced to writing,

[Monongahela Navigation Company v. Fenlon.]

evidence of conversations of previous negotiations cannot be given in opposition to the written memorandum. The latter must be understood as expressing the final intention and understanding of the parties. The stipulations in the notice would seem at one time to have been intended as fundamental articles of the company, and which consequently the contractors would be bound to notice, and to which they would be bound to conform. For some cause, however, it would appear that the parties altered their views; for, by the latter agreements, the contractors are required to commence the work by procuring materials within twenty days from the date of the contract, which is directly inconsistent with the notice, which declares that no work, preparatory or otherwise, is expected to be done at Lock No. 4, during the season. In the agreement, they enumerate, with some particularity, the causes for which the president and engineer may have the right to put an end to the contract, but say nothing as to the absolute right to suspend operations at a particular stage of the work. Why this discrepancy between the notice and final agreements has not been explained, but the implication is strong that the parties intended to merge all previous stipulations in the final contract. Nor is there any room for the supposition that this clause was omitted, either by fraud or mistake, as there is no evidence from which this inference can be fairly drawn. There was nothing to take it out of the general principle, and therefore the court were right in excluding the testimony.

The cases, then, depend on the agreements of the 26th of September 1840. The company, having ascertained their inability to continue operations, in consequence of the unforeseen failure of some of the stockholders, and particularly the Bank of the United States, on whom they confidently relied, passed a resolution on the 18th of May 1841, that the work on Lock and Dam No. 4 be suspended for the present. This the plaintiffs consider as a recision of the contract, a discharge, dismission, prevention and hindrance from the execution and performance of it. I say they must so consider it; for, except that, there is nothing in the evidence which supports these allegations in the declaration. Nothing is proved which gives countenance to the idea that the plaintiffs were in any way prevented from performance on their part. For anything that appears, they were at full liberty to proceed with the work, with however the certainty of what they were properly and in time notified of, the inability of the company to comply with their engagements. As the court very justly observes, there was no pretence that the company had not acted with good faith. There was no wantonness in suspending operations. Funds, on which they relied with the fullest assurance, were found deficient at a critical moment, and a suspension of the work was the only means left them, unless the contractors had been willing to go on with the work and take the risk of consequences. At the time of

IV. — 27                    s *

[Monongahela Navigation Company v. Fenlon.]

the agreement, the plaintiffs were aware, as there is reason to believe, of the situation of the company, of the amount paid in by the stockholders, of the sources from which they derived their funds, and of the risk which must necessarily attend a public undertaking of this description. And with a knowledge of all the circumstances of the case, they very properly assented to the proposition to suspend further progress in the work; at least, we hear of no protest against it, or any offer, (which in truth could not be reasonably expected), to complete the contract.

The question then recurs, by whom is the compensation of the plaintiffs to be estimated? and this is the main point in the cause. The plaintiff sets out in his declaration the agreements of the 26th of September 1840, or, what is the same thing, refers to them, and by consequence makes them part of his case. After stating the price to be paid the contractors, the manner of paying them, the causes for which the company may declare the contract abandoned, the agreement contains the following clause: " It is mutually agreed between the parties to these presents, that in any dispute which may arise between the contractors and the company, the decision of the engineer shall be obligatory and conclusive, without further recourse or appeal." This stipulation, or one like it, forms part of every contract with the agent for the public works of the Commonwealth, and it is believed it has been adopted by every *private* company in the State and in the neighbouring States, engaged in similar undertakings. Experience, which is the best test, has shown its beneficial effects, and, indeed, its absolute necessity; for without it, it is next to a certainty the company would be constantly harassed with vexatious and ruinous litigation. In any contract of this kind, to avoid unpleasant and unprofitable controversy, it has been found expedient at least to clothe the engineer with great power in relation to the conduct of the contractors, and the manner of performing the work; and in all cases, when disputes arise, it is usual to constitute him the absolute judge. His decisions, to use the language of the agreement, are without appeal, and extend to *any*, and, let me add, *every* dispute which may arise *between the contractor and the company*. It must be admitted that the language is sufficiently comprehensive to embrace the present controversy, and if we are not governed by it, it is because this case forms an exception to the general rule. Here there is a suspension, or if you will, a mutual recision of the contract: a dispute has arisen between the company and the contractors, and by whom is that dispute to be settled? The answer is, by the engineer, a judge of the parties' own choosing; for the agreement says, when *any* dispute arises, it is to be settled on an estimate made by the engineer, and that estimate shall be conclusive and without appeal. To the question why it does not apply, it is answered, because the company first violated the contract in not providing funds for the successful prosecution of the work.

This, it is granted, they were bound to do, and if the company had acted in bad faith, there would be something in the argument; but, as this is not pretended, and is in truth contrary to every fact in the cause, we see but little in the objection. Where the suspension or abandonment, *as is the case here*, arises from unforeseen contingencies acquiesced in by all parties, the force of the position is not perceived. And this construction, we conceive, is in accordance with the spirit as well as the letter of the agreement; for the contingency which has occurred is precisely one where an intelligent and honest engineer would be most competent to administer exact and equal justice between the parties; and without intending any disparagement to the ordinary tribunals of the country, it is a controversy which in its nature they are least fitted to decide. Had the case been foreseen, we cannot permit ourselves to doubt it would have been expressly provided for, and not left, as it is here, to general words, under a supposition that these are sufficiently explicit to preclude cavil and prevent disputes. The engineer employed by the company is perfectly acquainted with all the details of the work, and certainly more competent to determine any difficulty which may arise than a jury indifferently selected, and without the requisite information or the power to acquire it. It has been urged that the clause, as to the power of the engineer, is limited to the subsistence of the contract *or when the work is in actual progress*. But this view of the case is more plausible than sound. Where the agreement is declared to be abandoned, and the contract ended, for any of the causes enumerated in the agreement, it will not be pretended the contractor can be permitted to appeal to a court and jury without a previous arbitrament of the engineer, or an offer by one, and a refusal by the other, to refer the dispute to his decision. An award made by a referee who is appointed by the parties to set a price on an article, is an arbitration recognised by the Roman law, as well as the common law, and can only be set aside by proof of fraud by the arbitrator, or such gross mistake as may be evidence of fraud.

On the trial the deposition of the Chief Engineer was given in evidence. He proved that he had made an estimate of the work; that on a complaint by one of the plaintiffs, he expressed a wish to the board of managers that a careful remeasurement should be made by his assistants in the presence of the parties; and that he directed his assistants, Messrs Cass and M'Dowell, to make a remeasurement, and an examination of all the work, and correct any errors they might find in his estimate. This estimate was accordingly made, examined and approved by the engineer, and formed part of the evidence. In the opinion of the engineer, the compensation allowed was liberal and just, made upon fair and equitable principles; was a compensation for all damages suffered in consequence of the suspension, and for all work performed by

[Monongahela Navigation Company v. Fenlon.]

the plaintiffs. But whether this be so, is not open to question : he was the umpire between them, and it is not pretended it was made in bad faith; nor is there any evidence of gross mistake. It is said, however, it was made without notice; and whether this be so, does not with any certainty appear ; and if it be true, it is an irregularity which may be corrected by insisting on another estimate to be made in the presence of the parties. It has been also said it should be under oath; but we do not deem this necessary, as we cannot believe that this formality was within the contemplation of either party. And finally, it is urged that he was a stock-holder, and for that reason incompetent to make the estimate. It is a general rule of law, founded on the first principles of natural justice, that a man cannot be a judge in his own cause. But to this rule there are some exceptions; for the party himself may waive, and thereby preclude himself from any objection to a decision on that account: for if the party himself waive it, or agree to the submission, either at the time, or by previous contract, he cannot afterwards make the objection, that the plaintiff was a judge in his own cause. Thus, in *Matthew* v. *Ollerton*, (*Comb.* 218), it is ruled that the defendant may refer to the plaintiff himself, if he will. And Dolbin, J., said he remembered a case where a gentleman's steward brought an action in his master's name, and the defendant entered into a rule, by consent, to pay what the plaintiff should see fit; and my Lord Hale held it to be a good submission. Vide *Hunter* v. *Bennison*, (*Hardres* 44), to the same point. So Sergeant Hards took a horse as a deodand from the bailiff of the Archbishop of Canterbury, for which the Archbishop brought his action, and that coming to a trial at the assizes in Kent, the Sergeant offered to refer the matter to the Archbishop himself, which was accordingly done by rule of court: the Sergeant afterwards applied to the court to have the award set aside, on the principle that it is unjust that a man should be judge and party; but the court thought the objection of no force, and refused the motion. *Kyd on Awards* 42. Thus it appears, that whether the objection be well taken will depend on the contract; and if at the time it was entered into the plaintiffs knew that the engineer was a stock-holder, they may be considered as having waived it; and this is certainly so, as regarded the ordinary estimates which it was his duty to make during the progress of the work.

But these are points which are not very material to the decision of the case, as we think the cause is with the defendants on another ground. It must be recollected that the compensation to which the plaintiff is entitled depends on the estimate of the engineer; that it is part of the contract that the valuation should be made by him, and that when any dispute arises between the contractor and the company, his award is final. It is then part of the *plaintiff's* case, and not matter which comes in by way of defence. From this, it follows that it is incumbent on the plain-

[Monongahela Navigation Company v. Fenlon.]

tiff to aver and prove that a valuation or estimate of the work was made according to the requirements of the contract. Such proof is a *sine qua non,* without the benefit of which he is not entitled to recover. It also follows that the court erred in admitting evidence of the value of the work other than the estimate made by the engineer, the only competent authority to investigate and decide it. Thus, if A contracts to build a house for B in a workmanlike manner, at a price to be fixed, and in a manner to be approved by C, A cannot maintain an action against B without proof that C had inspected and valued the work, or that C had refused to value it, or that for some reason it was impossible the contract in that particular could be carried into effect. And this is reasonable, because it may be, without such stipulation B would not make the contract at all. Indeed, we need no stronger illustration of the principle than the case in hand; for it is absolutely certain that without this, or a similar provision, the plaintiffs would not have obtained the contract. We have grounds for believing that the company would not have agreed that in case of a disagreement between them and the contractors, the latter should be at liberty to appeal to the uncertain determination of a jury, where they would have to encounter all the prejudices, which are too apt to be entertained against all corporations or monopolies, as they are called, of every description; a tribunal, too, which from its very constitution, and the nature of the controversies which would probably arise, is utterly unfit, however well disposed, to do justice between them. Such a contest as this is precisely the one in which a person who is perfectly acquainted with the whole work, and the merits of the case, is most competent to decide. This, at least, was their opinion, and neither party is at liberty to depart from this essential part of the agreement.

Thus the case stands on principle; but we are not without authority to the same point; as in *Enniss v. O'Conner,* (3 *Harris & John.* 163). The case was this. The plaintiff brought an action of covenant on a contract, as follows : " Articles of agreement between Catharine Welsh of the one part, and Joshua Enniss of the other part, witnesseth, that the said Enniss doth covenant and agree to finish the carpenter and joiner's work of a house for the said Mrs Welsh; on Bond street, in a plain, workmanlike manner, *as may be adjudged by a carpenter or joiner, as may be hereafter appointed ;* and the said Catharine Welsh, on her part, doth covenant and agree to give the present advance as the measurement of the aforesaid work." The plaintiff offered in evidence by *persons not appointed* by the parties for that purpose, that he, after the execution and delivery of the contract, and in compliance therewith, did progress in the completion and finishing of the carpenter's and joiner's work of the house mentioned in the contract of the defendant, in a plain, workmanlike manner, and was willing to have completed and finished the whole carpenters and join-

[Monongahela Navigation Company v. Fenlon.]

er's work of the house in a plain, workmanlike manner, but Catharine refused, &c., and discharged him from the same. He further offered in evidence, by the testimony of witnesses *who were not appointed* according to the manner prescribed in the contract, that the value of the work so done by him amounted to the sum of ——, and that the damages sustained by the plaintiff by reason of not being able to finish the work according to the contract amounted to ——. On this case, Chief Justice Ridgely was of opinion, which opinion was afterwards confirmed by the whole court, consisting of Chase, C. J. Polk, Buchanan and Gantt, J. that the plaintiff was bound to show, in order to entitle him to recover, by a *person or persons appointed for that purpose by the parties*, that as far as he had progressed in the building he had executed the same in a plain, workmanlike manner, &c; and that the plaintiff having offered no such evidence, it was irrelevant to go into evidence to show that the plaintiff was prevented from going on with the work by the defendant, Catharine, or to go into any evidence of the damage sustained by the plaintiff. The principle of the case is this; that as it was part of the contract that the work should be done in a plain, workmanlike manner, to be ascertained in a mode pointed out by the parties, it was necessary for the plaintiff to prove affirmatively that that course had been pursued, and that having omitted to prove this by persons appointed for that purpose, the plaintiff could not sustain his action. In the case in hand, not only is the manner of estimating the compensation set out in the contract, but the persons by whom the estimate is to be made, and in that respect it is a stronger case than the one cited. There, as here, the work had not been completed, and it was offered to be proved that the plaintiff was prevented from performing his contract by the defendant.

The view which we have taken of this point makes it obviously unnecessary to review the many errors which have been assigned in the course of the trial, and the charge of the court. It will, however, not be amiss to say, that in that there is error in relation to the rule of damages. The most the plaintiff can claim is, a compensation for the work done at the time the contract was rescinded, according to the price fixed in the contract, to be adjusted in such a way as that the company may not be compelled to pay more than a fair compensation at that rate for the whole work when finished. But this would not be the case, if the jury were at liberty to give not only the actual cost, at the contract price, but also the profits he would have made, had the contract been completed. We cannot believe that a contractor has such a fixed interest in the contract as is the subject of valuation, depending as it does on many contingencies, which cannot be appraised or estimated. On the whole case, we are of opinion that the plaintiff may, if he chooses, adopt the valuation already made, but if he does he must abide by it. In that case, he cannot be permit-

[Monongahela Navigation Company v. Fenlon.]

ted to introduce evidence to increase or in any way affect the compensation which has been already allowed. On the other hand, if he elects to repudiate the estimate, there is an end of his action. In that event there must be a re-valuation of the work by the only competent authority, viz., by the engineer.

Judgment reversed.