Osborne v. O'Reilly.

--- 

JOHN H. OSBORNE

*v.*

CATHARINE C. O'REILLY, exr. &c. of Patrick O'Reilly, deceased.

1. In 1861 a bill was filed charging, among other things, that defendant had agreed to convey to complainant an undivided half of certain lands in Pennsylvania, in consideration of complainant's services in taking care of the property for the defendant and assisting him in getting railroad ties &c. therefrom ; but that, although complainant rendered the stipulated services, the defendant did not convey the lands to the complainant, but conveyed them away to a third party. The defendant's answer, filed in 1864, denied this agreement. In 1881, defendant died.—*Held,* that complainant's testimony, taken after defendant's death, was incompetent to establish the terms of the agreement.

2. Various matters of account were in dispute in this suit. The bill (which was filed in 1861) did not set up anything pertaining to what was called the "Bowen farm claim," which indeed arose after 1861, nor was the claim set up by supplemental bill. The defendant died in 1881.—*Held,* that the claim could not be entertained.

3. A claim for property destroyed by complainant's own workmen in a riot, and for loss during a strike during a partial suspension of work on a railroad under the chief-engineer's orders, being merely a question of damages, is not

cognizable in equity, although asked for in connection with an accounting in respect of the work.

4. Complainant had agreed to do certain excavation, blasting &c. on a railroad, as a subcontractor under defendant, at a fixed price. The agreement was made under certain representations by the company as to the character and quality of the rock to be removed; whereas, in fact, the rock proved to be much harder than represented and more expensive to drill, and worthless afterward for foundations, culverts &c. ' The defendant thereupon promised to allow complainant an additional sum per cubic yard therefor, but never paid it.—*Held,* that his estate was liable to account therefor, and that the provision in the contract that all questions concerning the quantity and quality of the work, and the amount of money payable therefor, and the due execution of the contract, should be submitted to the chief-engineer of the company for final determination, was not applicable to such promised additional compensation, and hence the fact that complainant did not submit his claim therefor to such chief-engineer did not invalidate it.

5. A settlement of a certain account by an account stated had been made, but it was alleged that there was a mistake in the settlement apparent upon the face of the account. On the other hand, it was alleged that there was in fact no error, but only a seeming one.—*Held,* that the party alleging the mistake should, under the circumstances, have an opportunity to show it, if he could, and that to that extent the account should be opened, but no further.

Bill for injunction and account. On final hearing on pleadings and proofs.

*Mr. H. A. Drake,* for complainant.

*Mr. P. L. Voorhees,* for defendant.

THE CHANCELLOR.

The bill was filed against Patrick O'Reilly (he has since died), and the object was to stay proceedings in an attachment suit brought in Camden circuit court by O'Reilly against the complainant, and to get an account of certain transactions and dealings between the complainant and him. One of those transactions is in reference to a locomotive engine, called the Sea Gull, which the complainant says he purchased for O'Reilly and at his request and with his money, and at the like request took the title thereto in his, the complainant's name, and leased the engine to the Camden and Atlantic Railroad Company. The complainant

alleges and insists that such leasing was in behalf and on account of O'Reilly; while, on the other hand, the defendant insists that O'Reilly leased the engine to the complainant, who, in turn, leased it to the railroad company. Another matter, in reference to which the complainant claims an account, is extra work which he insists was done by him for O'Reilly both under and outside of the complainant's contract with O'Reilly, hereinafter mentioned, for graduation &c. of certain sections of the Lebanon Valley Railroad. In April, 1854, O'Reilly had the contract for the construction of about forty miles of that road, and the complainant and one Charles Tarrant, under the firm name of Tarrant & Co., then entered into a subcontract with him for the construction by them of thirteen sections of one mile each. They entered upon the work, and in October following the partnership was dissolved by the withdrawal of Tarrant, whose interest under the contract passed to the complainant, who completed the work. The complainant insists that the terms of that contract were changed in respect to the price of excavating solid rock and hard clay; and he claims that consequently in the account he is entitled to a higher price therefor than that fixed by the contract. The work was partially suspended for several months, from about the 1st of October, 1854, and during that period there was what is called a "strike" of the complainant's workmen, during which some of his property was destroyed. He claims that O'Reilly's estate is liable to him for the damages he so sustained, and he prays an account thereof accordingly. . He also makes claim for damages which he sustained by that suspension of the work, in the rise of wages and price of materials which he had to purchase &c. Another matter is the purchase and sale of a tract of woodland in Pennsylvania, called in the case "Greenwood," and another is the purchase of a farm for George W. Bowen. The answer admits that there should be an account, but it makes counter-claims against the complainant, among which is a claim for the price of certain personal property sold and delivered by O'Reilly to the complainant, and a claim that a balance is due to the defendant on account of moneys of O'Reilly, which came to the complainant's hands as agent and superintendent for

O'Reilly under the contract of the latter for the construction of the Camden and Atlantic Railroad.

As to the claim in connection with the locomotive engine Sea Gull, the complainant claims, as before stated, that the engine, which it is admitted was bought by O'Reilly to be used upon the road of the Camden and Atlantic Railroad Company (the company was in embarrassed circumstances), of which road the complainant was superintendent, and in which O'Reilly was interested, was leased by him in his own name, but as O'Reilly's agent, to the Camden and Atlantic Railroad Company. To recover arrears of rent, he took legal proceedings, at some expense for counsel fees &c. He received from the company, in a settlement and composition, satisfaction for his expenditures, and took some of its preferred stock for the money due for the unpaid rent. He claims that he made the settlement with O'Reilly's consent and by his authority, while the defendant, on the other hand, insists that O'Reilly let the engine to the complainant, and that the latter, and not the company, was responsible to him for the rent. As already stated, the complainant alleges that he bought the engine at O'Reilly's request, and by his direction and for him, and with his money, and at O'Reilly's request took the engine in his (the complainant's) name. The answer denies that the complainant bought the engine or took title to it. But it states that he urged O'Reilly to buy it and let it to the company, which O'Reilly refused to do, and that then the complainant requested O'Reilly to buy an engine for use upon the road and let it to him, to which proposition O'Reilly acceded and bought the engine accordingly and let it to the complainant. In an account rendered to O'Reilly, by the complainant, of money placed in the complainant's hands for a special purpose, as stated in the bill, the complainant charges O'Reilly with $22.35 for expenses incurred in July, 1855, in furnishing the engine, and with expenses ($65.74) paid in September, 1857, consequent upon moving it, and he credits O'Reilly, under date of December 27th, 1855, with $104 for "surplus of purchase-money of Sea Gull engine in July, 1855." O'Reilly did not object to those

charges òr to that credit, so that it seems clear that the complainant's statement that he bought the engine for O'Reilly and with O'Reilly's money is true. The complainant leased the engine to the company in his own name, but there is no evidence, except the statement in the answer, that O'Reilly ever leased or transferred the engine to him. There is evidence in O'Reilly's letters that the complainant's statements upon this head are truthful. His claim to an account is valid.

To consider the claim in reference to "Greenwood:" The bill states that in or about October, 1855, O'Reilly, who had purchased a tract of land of about thirteen hundred acres, in Pennsylvania, called Greenwood, said to the defendant that the timber upon the land would be of great advantage to him, O'Reilly, for furnishing railroad ties for the Lebanon Valley Railroad, for the construction of about forty miles of which he had, as before stated, a contract; that the ties would in value be more than sufficient to pay the purchase-money of the property, and that in view of his numerous obligations for kindness to the complainant he would let him have an interest of one-half in the tract if he would take charge of the property, and assist him in obtaining ties therefrom and in sending them to the railroad. It further states that the complainant agreed to this, and accordingly rendered the service, and made expenditures contemplated by the agreement, but that O'Reilly did not convey the promised interest in the land to him, nor any interest whatever, but sold the property to another person. The answer denies that such was the agreement, and alleges that in fact the agreement was for a partnership between the complainant and O'Reilly—the former to pay half of the purchase-money of the property, which he subsequently refused to do. What the agreement really was does not appear. O'Reilly died in 1881. He filed his answer in 1864. The bill was filed in January, 1861. From the time of filing the answer to his death, a period of seventeen years, no step was taken in the cause. O'Reilly was dead when the complainant gave his testimony in the suit; the complainant is therefore not competent to testify to any transaction with or statement by O'Reilly. *P. L. of 1880 p. 52; Lanning* v. *Lanning,*

*2 C. E. Gr. 228.* There is no other direct evidence upon the subject. Nor does the evidence in the case support the claim of the answer that there was a copartnership. The complainant is entitled to compensation for his services and expenditures in the matter, and to an account accordingly.

The transaction in regard to the Bowen farm was as follows: In 1857 O'Reilly and the complainant proposed to assist Bowen in the purchase of the farm by advancing him money to aid him in the payment of the purchase-money, $4,800. The complainant paid $1,300 in cash, and he and O'Reilly endorsed Bowen's notes for $1,500. For the rest ($2,000) of the price Bowen gave a first mortgage to Bean, the vendor, upon the property. To secure the $2,800 to the complainant and O'Reilly, Bowen conveyed the property to them by deed dated December 8th, 1856, and they executed and delivered to him a defeasance, dated April 1st, 1857, declaring that the conveyance was made to secure the payment of that money. Afterwards they reconveyed the farm to him, and he mortgaged it to the complainant alone, to secure the $2,800. The complainant paid the notes, and the property was sold. After applying the proceeds of the sale, there remained a deficiency of $1,114.50. The complainant claims that there is due to him from O'Reilly's estate, upon this Bowen matter, over $1,773. The bill says nothing of this claim. The sale appears to have taken place in the spring of 1868. From that time to the death of O'Reilly, in January, 1881, was a period of about thirteen years. It was not until the death of O'Reilly that this matter was introduced into the case, and then it was brought in, not by the pleadings, but by the evidence. Not to speak of the bar of the statute of limitations, it would be unjust to the estate of O'Reilly to require an account upon this claim under the circumstances. The complainant might have set it up by supplemental bill, but he did not see fit to do so. Common justice, no less than the demands of correct practice, required him to set up his claim in that way, and so notify the defendant that he intended to hold him liable thereon. He, having made no claim in any way in respect of that matter for more

than six years (it was in fact more than thirteen) after the alleged liability accrued, cannot be permitted to set it up.

The complainant proves, and the defendant does not deny, that the former did extra work, and furnished extra materials under the before-mentioned subcontract for railroad construction, and did work, and found materials outside of the contract, among other things, obtaining what are called "wood leaves" (the right to cut down, and remove, and use standing timber) for O'Reilly, and hauled ties for him to the railroad, and distributed them there, and did other work for O'Reilly. There should be an account between the parties as to all those matters. No particular directions are necessary in reference to them.

The claim which the complainant makes upon the estate of O'Reilly for damages sustained by him in the destruction of his horses, wagons, harness &c. by (as it is alleged) his own workmen, in a riot, in what is known as a "strike" by them for the immediate payment of their wages, or for an increase of pay instead thereof, cannot be allowed. The work was suspended about the 1st of October, 1854. In the latter part of the winter, or early in the spring following, the complainant's workmen being idle, Mr. Bowen, who was the complainant's cashier and book-keeper, and, during his absence, his general manager, spoke to Mr. O'Reilly upon the subject, saying that it would be a good thing if they could be set at work. To which O'Reilly replied that they would probably be willing to go to work under an agreement to wait for their pay until the 15th of May. Bowen acted upon the suggestion, and the men went to work under that agreement. On the 1st of May they demanded their pay (although it was not yet due according to their agreement), or an increase of wages. The complainant could not pay them, and refused to increase their wages. They then "turned out upon a strike," as it is termed, and, during the strike, the complainant's property, for which his claim is made, was destroyed by fire. There is obviously no ground upon which this claim can be supported. Nor can the claim of the complainant to damages for suspension of the work be sustained. The work was suspended (but only partially, however) by order of the

chief-engineer, from about the 1st of October, 1854, until May following. As appears in the preceding remarks on the subject of the claim for damages for the destruction of property in the riot, in the latter part of the winter or early in the spring, the work was resumed and proceeded until the 1st of May. The complainant says that work in rock was suspended, but not work in the clay. Bowen testifies that the work was resumed sometime in April or May; that there were some forces put at work in some of the rock sections in March or April. The company awarded to the complainant $2,500 damages (which he received) for the injury done him by the suspension. Being dissatisfied with the award, he looks to the estate of O'Reilly for such additional compensation (claiming that his damages were about $7,500 more) as will indemnify him. This is a mere question of damages, and, as such, is not within the jurisdiction of this court. *Palys* v. *Jewett, 5 Stew. Eq. 302.* And the fact that it is introduced in connection with a claim for an account, makes no difference. *1 Pom. Eq. Jur.* § *178.* The company, on account of a temporary lack of funds wherewith to meet the expenses of the work in full, caused it to be partially suspended for a while by directing that the amounts to be paid to O'Reilly's subcontractors be limited to $6,000 a month until further order to the contrary. The complainant appears to have acquiesced. He might have gone on with the work with his full force at his own cost, taking the risk of getting his pay from O'Reilly, or, if he was not bound under the contract to submit to the suspension, he might have rescinded the contract, but he did neither. The contract provided that the work should, in every respect, be prosecuted in such order and at such places and parts thereof, and at such time and seasons as the engineer might direct. In *Monongahela Navigation Co.* v. *Fenlon, 4 W. & S. 205,* where the company had, for a like reason, wholly suspended the work for a time, it was held that, in view of such a provision in the contract, such suspension was within the contemplation of the parties, and also that an award of damages by the engineer made under a provision in the contract for submission to the final arbitrament of the engineer of all disputes aris-

ing between the contractor and the company, was conclusive, and bound the parties. The contract in the case in hand provides that, to prevent all disputes, the engineer shall, in all cases, determine the amount or quantity of the several kinds of work which are to be paid for under the contract, and the amount of compensation at the rates therein provided for, and also that he shall, in all cases, decide every question which can or may arise relative to the execution of the contract, on the part of the contractors, and that his decision shall be final and conclusive, and without appeal. It does not appear that in this case any application was ever made to the engineer upon the subject of damages for the suspension, or that he ever passed upon the matter.

It remains to consider the claim of the complainant to compensation for the removal of solid rock. The contract provides that the complainant shall receive, for the excavation of solid rock requiring blasting or sledging, sixty-five cents per cubic yard. It also provides that stratified rock requiring sledging or blasting shall be paid for as solid rock. When the contract was taken the company represented that the rock to be excavated in the sections mentioned in the complainant's contract was limestone. It proved to be, in fact, as represented, in its general character, but in one or two of the sections there was found an intervening stratum of trap rock, exceedingly hard, not stratified, with hidden fissures and openings through it, and which it was very difficult and expensive to blast, and which could not be broken by sledging. When broken, it broke up into small fragments, unfit for bridge building, and of no use except in making embankments.

There appear to have been in some places large masses of white flint, through which it was almost impossible to drill for blasting. The engineer of the company testifies that it was stated to the contractors, for their information and guidance in making their bids, that the rock was the ordinary magnesian limestone, easily drilled, and affording good building stone which the contractors could use in the erection of their structures, bridges and culverts &c. He says that when cut into for the purposes of excavation, a large part of it was found to be trap rock, in which

hornblende, quartz, feldspar and minute imbedded crystals and iron were all combined, and which afforded good barriers against a steel drill, and did not give a building stone, the blast producing irregular and small stones. He says that this rock was found, in a great measure, through the second division, which was covered by the complainant's contract; that the whole of the rock in the second division partook of the character of trap rock, but the upper portion of that rock, down to perhaps half of its depth, was not so hard as the lower; that somewhat more than half of that rock, embracing the upper portion, was excavated by the contractor about the middle of 1855, and although it was not so hard as the portion underneath, yet that at that date there had been a loss to the contractor, and that subsequently to that time it became evident to the engineer and to the contractor-in-chief that the prices in the contract for that work were inadequate. In view of the unexpected character of the rock, the engineer was authorized by O'Reilly to allow the complainant the same price (seventy-three cents per cubic yard) which he received from the company for excavating solid rock. In his letter to the complainant, dated November 3d, 1855, O'Reilly said that he was well aware that the rock, in some of the sections of the second division, was very hard and could not be excavated at the price (sixty-five cents per cubic yard) fixed in the complainant's contract, and that therefore he would assist him on those sections, and on some of the brick bridges which he said he perceived required an advance. In a subsequent letter to the complainant, of December 14th, 1855, he said that he was aware that the complainant's prices for hard rock would not carry him through, and that he was also aware that his (O'Reilly's) prices would not pay for taking out that rock in some of the complainant's sections, and that therefore, in order to enable him for the present to carry out the work, he would allow for hard rock seventy-three cents, that being his own price, and that he regretted that he could not do any better for him at that time, and he added :

"However, I trust to be enabled to carry you through without sustaining any loss. From my experience in rock excavation I know that the rock on

some of your sections cannot be excavated for less than eighty to eighty-five cents per cubic yard. I will make good the deficiency (loss), $9,156, as per statement."

When that letter was written, the complainant had refused to proceed with the work until a satisfactory arrangement as to price should have been made. In a letter of November 7th, 1855, to O'Reilly, he said that he could not consent that the matter should be longer deferred, and that he would thank O'Reilly to give him an answer before the 15th of the month.

It is clear from the testimony that he refused to proceed with the work, unless he should receive a satisfactory assurance as to increased and remunerative pay for so doing, and that O'Reilly was anxious that he should go on with the work, and, in order to induce him to do so, promised that he should receive such pay. It appears that in December, 1856, O'Reilly received from the company $20,000 in its promissory notes, to re-imburse him for his loss on his contract, by reason of his extra payments to his subcontractors in respect to the solid rock, of which sum he then paid $8,000 to the complainant on account of his extra compensation. In November, 1859, O'Reilly brought suit against the Philadelphia and Reading Railroad Company, into which the Lebanon Valley Railroad Company had been merged, to recover further compensation upon the same account; and in December, 1861, he tried to bring about a compromise of the suit, and to that end applied to Richard B. Osborne, who was chief-engineer of the new company, as he had been of the old, to assist him therein. From the testimony of Mr. Osborne, it appears that in March, 1857, O'Reilly was constrained to raise the complainant's compensation for excavating hard clay from twenty-two cents per cubic yard, the contract price, to twenty-three and a half cents, but that this was not sufficient to enable the complainant to pay expenses upon the work, and that the work would therefore have stopped, unless the chief-engineer (himself) would supply the funds necessary to keep it going, relying for his protection, in so doing, upon the promise of O'Reilly, and the application of the latter to the company for an extra allowance on account of the rock. O'Reilly then got a

promise from the chief-engineer to endorse and favor his appli-
cation for such extra allowance. In December, 1861, O'Reilly
called upon Osborne, at the office of the company, and, remind-
ing him of his promise, urged him to assist him in getting a
settlement of the claim for which he had brought the pending
suit. Osborne says that O'Reilly then made verbal statements
to him of his claim, of which he made notes at the time, and
that he, Osborne, selected such items as he thought he would
be justified in including in his application to the president of the
company; that he then left O'Reilly in his office, and went
down stairs to the president, and laid before him the items upon
which he, as engineer, deemed it proper that the president should
make an allowance; Osborne stating at the same time that the
board of the Lebanon Valley Railroad Company had already
(in December, 1856) given to O'Reilly $20,000 on account of
his claims upon that (the complainant's) and other sections.
He says that the result placed before the president appealed to
him for an additional allowance of $40,000 to O'Reilly; that
the president acquiesced in it, and authorized him to offer that
sum to close the matter; that he returned to his office, and found
O'Reilly there; that he, Osborne, made a memorandum, show-
ing upon what he had based his statement to the president for
the allowance, at that time, of $40,000, after deducting the
$8,000 which had been paid to the complainant in 1856. He
says that he based the application upon his knowledge of the
work during its progress; that he took forty-eight per cent. of
the solid rock as the portion, upon excavating which the loss
had occurred; that the total amount of solid rock estimated to
the complainant was one hundred and fifty-four thousand three
hundred and sixteen cubic yards, forty-eight per cent. of which
amounted to seventy-four thousand and seventy-one cubic
yards; that he put that at $1.38 per cubic yard, which was
sixty-five cents per cubic yard in addition to the price, seventy-
three cents, allowed to and paid by O'Reilly. This produced
the sum of $102,217, from which he subtracted the amount,
$53,999, allowed in the estimates for the work, and the balance
was $48,218, from which he took the $8,000 paid to the com-

plainant on account of extra pay, and the balance was $40,218, in view of which the offer of $40,000 was made. Osborne says that O'Reilly made claims upon other grounds, but they were not recognized as valid by him, and were not included in his, Osborne's, statement to the president. He says that there was a very great number of items upon which O'Reilly claimed additional compensation from the company, all of which were provided for by prices contained in the contract, but there was nothing in the character of that work which he deemed sufficient to justify him in making any claim for O'Reilly, or interfering with the contract; that O'Reilly complained that those items had been omitted by Osborne in his statement, and the latter reminded him that it was only upon those sections where O'Reilly had given his subcontractors the price which he himself was to receive, to enable them to complete work which he was forced by the chief-engineer to finish at whatever cost, within a stated time; that the engineer was justified in calling upon the company to pay him the additional price which he had been compelled to pay his subcontractors. The offer of $40,000 was rejected. Afterwards the suit was settled on the 12th of the same month of December, 1861, by O'Reilly, for a smaller sum, $38,000.

It appears by the release given by him upon the settlement, that as part of the consideration of the payment of that sum, he was to relinquish to the company his claim to one thousand shares of the capital stock of the Lebanon Valley Railroad Company, and, if necessary, transfer the stock to the Philadelphia and Reading Railroad Company. It would seem, from the facts above stated, to be quite clear that the claim to extra compensation for the rock excavation done by the complainant, not only entered into the settlement, but formed a very considerable part of the consideration for which the $38,000 were paid. My conclusion in this matter, however, is not based upon the assumption that O'Reilly did in fact receive such allowance of extra compensation from the railroad company, but upon his promise to pay the complainant such additional compensation for excavating the rock as would protect him from loss. It is urged by

Osborne *v.* O'Reilly.

the defendant's counsel that in view of the fact that the com-
plainant was bound by the contract to excavate the rock at a
price therein named, any promise made to him by O'Reilly
under the circumstances stated in this case, to pay him more than
that price, was wholly voluntary and without consideration, and
will not support a claim for further compensation, either at law
or in equity. But it is quite evident that great and unexpected
difficulty in the work was encountered after the contract had
been entered into, and that that difficulty was not only unfore-
seen, but the contractor was, in effect, informed, when he entered
into the contract, that it did not exist. He was informed that
the solid rock which he was to excavate was limestone. The
representation, though innocently made, misled O'Reilly and the
complainant. The complainant, finding it impossible to do the
work at the price fixed in the contract, because of the character
of the rock, refused to proceed with it, and in fact rescinded the
contract on the ground of the false representation. In a letter
to O'Reilly, dated October 4th, 1855, the complainant says:

"I have concluded that I am not doing myself justice, with the prospect
before me of high wages, high feed and the increased cost of powder, to go
on further without some understanding from you. The least price that will
enable me to prosecute the work to completion, will be an average of twenty
cents per yard. For less than this I would not undertake it."

The complainant thus refused to go on unless he should
receive eighty-five cents instead of sixty-five cents, the con-
tract price. O'Reilly did not insist upon the performance
of the contract as to the rock, but on the other hand, ac-
knowledged the justice of the complaint, and induced the
complainant to proceed with the work by promising to
give him all of the price (seventy-three cents per cubic yard)
which he himself was to receive for the work, and at the
same time saying that from his experience in rock excavation,
he knew that the rock in some of the sections could not be exca-
vated for less than eighty to eighty-five cents per cubic yard,
and promising to indemnify him. Bowen testifies that O'Reilly
was notified of the hardness of the rock and of the inability of

the complainant to complete the work at the price fixed, inasmuch as the estimates for several months did not pay for the powder, and he says O'Reilly gave assurance that the price would be increased.   Richard B. Osborne says that O'Reilly urged the complainant to finish the work and make good his (O'Reilly's) contract with the company, and said that he would see that the work was paid for, including the extra cost.   In his letter of December 14th, 1855, to the complainant, O'Reilly says that he trusts that he will be enabled to carry the complainant through without loss.   That there was ground to claim a right to abandon the work and rescind the contract for the reasons already given, is manifest.   And it is evident that the complainant went on with the work only in consideration of O'Reilly's promise to indemnify him against loss.   By his agreement to protect the complainant from loss in the excavation of rock, if he would proceed with the work and not abandon it, O'Reilly waived performance of the contract as originally made in regard to the excavation of rock, and the parties substituted a new one in its place.

   The defendant's counsel insists that if the new agreement was binding and the complainant was entitled to compensation beyond that which was stipulated for in the contract, the claim should, under the provisions of the contract, have been passed upon by the chief-engineer, and that, inasmuch as the complainant did not present the claim for allowance to the chief-engineer, he cannot maintain any action or suit for it.   But the provision to which he refers has reference to questions as to the quantity or quality of work to be paid for under the contract, and the amount of compensation at the rates provided for in the contract and to questions relative to the execution of the contract.   The question whether the complainant is entitled to an extra allowance or price beyond that provided for by the contract, does not arise under the contract and is not a question relative to the execution of the contract within the meaning of the provision under consideration.   The provision, therefore, is not applicable to it.   The complainant is entitled to an account

31

of the work of excavating solid rock at a fair and reasonable price therefor.

As to the defendant's claim to an account in reference to the money received by the complainant as agent and superintendent for O'Reilly. If there be doubt, under the evidence, as to whether the settlement which was made between the parties was not made under a mistake ; or, to state it differently, if it be doubtful, upon the case as it appears at the hearing, whether the account stated does not contain a mistake, the party who impeaches it is entitled to a review of the matter by way of an accounting in respect to it. It is admitted that the complainant charged O'Reilly twice in the same account (which is in two parts) with the sum of $2,346.79 ; once (in the first part) with $2,000 for salary and $346.79 for expenses, and again (in the second part) with $2,346.79, in one item, as " salary and expenses included in the above account," referring to the former two charges of $2,346.79. The explanation given of this double charge and the excuse for it are that a credit of $3,753.06, in the second part of the account, includes $2,346.79 credited in the first part in two items, one of $501.48, which embraced, it is alleged, $113.48 of the amount, and the other of $2,233.31, and that therefore it was necessary to charge the $2,346.79 twice to correct the error. That there was no fraud or attempt to deceive is manifest from the circumstance that the second charge states that it is for what had already been charged in the first part of the account. But the charge for salary is for salary from August 7th, 1853, to April 7th, 1854, and the credit of $3,753.06 is under date of March 24th, 1854—a period prior to the time when the term of service for which the salary was claimed expired. It may be that the salary was in part credited in advance. But the charge for expenses in the first part of the account is under date of August 7th, 1854, and is for expenses incurred from August, 1853, to August, 1854. As before stated, the credit of $3,753.06 is under the previous date of March 24th, 1854. It is urged on behalf of the complainant that Bowen, who made up the account, was O'Reilly's clerk, and not the complainant's, and that O'Reilly acquiesced in the statement of

the account.    But neither fact is entitled to much weight, in view of the circumstance that the error, if error there be, is manifest upon the face of the account.

The defendant is entitled to a further investigation of the matter, to establish, if she can, the alleged mistake.